CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

March 25, 2024
LAURA A. AUSTIN, CLERK
BY:
/s/T. Taylor
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| CHARLES CARTER, | ) | |
| Plaintiff, | ) | Civil Action No. 7:22-cv-00025 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| LARRY ROSS COLLINS, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Charles Carter is a Wyoming inmate housed within the Virginia Department of Corrections (VDOC) pursuant to an Interstate Corrections Compact (ICC) agreement between the Commonwealth of Virginia and the State of Wyoming.   Proceeding *pro se*, Carter filed this civil action under 42 U.S.C. § 1983 against more than 20 defendants, including the VDOC, the Commonwealth of Virginia, former VDOC Director Harold Clarke, ICC Coordinator Kyle Rosch, and seventeen correctional officials employed at Red Onion State Prison (Red Onion), where Carter remains incarcerated: Unit Manager Larry Ross Collins; Lieutenant D. Barton; Captain C.C. Gilbert; Major C. King; Correctional Officers A. Adams, B.K. Branham, T.C. Neece, Baker, P. Watson, Combs, and A. Stutzman; Hearing Officers K.D. Ramey and J.R. Adams;[1]  Grievance Office Services Assistant T. Trapp; Counselor R. Kegley, Unit Manager Swiney; and Warden Rick White.[2]   Chief United States District Judge Michael F. Urbanski transferred the case to the undersigned on March 20, 2024.[3]   (Dkt. No. 134.)

---

[1] To avoid confusion between the two defendants with the last name of Adams, the court will refer to them as A. Adams and J.R. Adams, respectively.

[2] The correctional officials are sued in their individual and official capacities.

[3] Prior to the transfer, Judge Urbanski granted dispositive motions filed by three other defendants (Laura Maughan, Nurse Trent, and Nurse Practitioner Jessee) and terminated those defendants from the case.   (Dkt. Nos. 99, 117.)

Carter's complaint consists of 40 handwritten pages, followed by multiple exhibits.   In the introduction section, Carter alleges that he is seeking relief under § 1983 for excessive force in violation of the Eighth Amendment, threats of retaliation in violation of the First Amendment, denial of access to the courts, and violations of his Fourteenth Amendment right to due process. He also references state tort claims and a claim for breach of contract.   (Compl. 2, Dkt No. 1.) The body of the complaint includes additional claims, as discussed herein.

Several claims stem from events that occurred on November 9, 2021, while Carter was housed in administrative segregation at Red Onion.   Carter alleges that correctional officers slammed him on the floor after he took a shower and physically assaulted him while he was in handcuffs and leg shackles.   (*Id.* at 8.)   Carter further alleges that officers escorted him to the medical unit in a defective wheelchair and that they "let [his] feet drag all the way to medical, maliciously and intentionally inflicting wanton physical pain and injur[ies]."   (*Id.* at 9.)   Carter asserts that two officers filed false disciplinary charges against him in an effort to justify their use of force and that other correctional officials attempted to prevent him from pursuing administrative remedies regarding the events that occurred on November 9, 2021.   Carter also challenges other aspects of his confinement at Red Onion, including his assignment to administrative segregation.

Pending before the court is a motion for summary judgment filed by the remaining defendants: the Commonwealth of Virginia, the VDOC, and the nineteen correctional officials identified above.   (Dkt. No. 108.)   Defendants argue that some of Carter's allegations fail to state a claim upon which relief may be granted and that certain claims should be dismissed because Carter failed to exhaust his administrative remedies prior to filing suit.   Carter has filed a response in opposition to the motion (Dkt. No. 112) and a motion to supplement his response

(Dkt. No. 123).   Defendants have filed an opposition to Carter's motion to supplement (Dkt. No. 124) and an additional declaration in opposition (Dkt. No. 128), to which Carter has filed a "declaration reply" (Dkt. No. 127).

For the reasons set forth herein, the court will grant Carter's motion to supplement his response to defendants' motion for summary judgment, and the court will grant in part and deny without prejudice in part defendants' motion.   Additionally, the court will dismiss other claims, pursuant to 28 U.S.C. § 1915A(b), for failure to state a claim upon which relief may be granted.

## I.   BACKGROUND

### A.   Factual Allegations in the Complaint

On the morning of November 9, 2021, defendants Combs and Neece removed Carter from his cell in the C-3 pod to take a shower.   The C-3 pod houses inmates assigned to administrative segregation at Red Onion.   After Carter showered, Combs and defendant Branham placed him back in handcuffs and leg shackles, but they did not "double lock the cuffs or shackles per policy."   When Carter headed in the direction of the C-3 pod kiosk, Branham told him that he could not use the kiosk.   Defendant Barton approached them, and Carter asked the officers to explain why he was being treated differently than another inmate who had been allowed to use the kiosk.   Branham subsequently tightened the grip that he had on Carter's right arm and forced Carter to move in the direction of Carter's cell.   (Compl. 7–8.)

As Carter was being led to his cell by Branham and Combs, Branham attempted to jerk Carter toward the cell door.   Carter looked at Branham and accused him of being "weak."   At that point, Branham, with the assistance of Combs, "tripped slammed [Carter] to the floor, while [Carter] was in handcuffs and shackles, unable to protect [his] head, face or any other part of [his] body."   Other correctional officers, including Barton and defendant Neece, arrived on the

scene, and the officers physically assaulted Carter while he was on the floor with his hands cuffed behind his back.   Because Combs and Branham had not double-locked the cuffs, they became excessively tight, causing excruciating pain.  (*Id.* at 7–8.)   Carter alleges that defendants Stutzman and Swiney were "present during the beating" and "failed to intervene." (Pl.'s Mot. to Substitute Defs., Dkt. No. 5.)   Carter became "periodically unresponsive" during the altercation, and he remembers hearing the voices of defendants Collins and King when he regained consciousness.   (Compl. 8.)

At approximately 8:40 a.m., Carter was placed in a wheelchair to be taken to the medical unit for an assessment of his injuries.   Defendant Baker pushed the wheelchair, and Baker was accompanied by defendants Gilbert, A. Adams, Watson, and King.   The wheelchair did not have any footrests to protect Carter's feet from dragging on the floor.   Nonetheless, these defendants "let [Carter's] feet drag [on concrete] all the way to medical," causing physical injuries to Carter's toes and feet.  (*Id.* at 9.)

After Carter was examined by a nurse, King directed officers to transport Carter to the medical housing unit in the same defective wheelchair.   When Carter complained that his feet were hurting, King told him that he should not have drug his feet on the floor.   A. Adams proceeded to push Carter to a cell in the medical housing unit, where Carter remained until the following day.  (*Id.* at 11–12.)

While Carter was in the medical unit, Collins approached him with a "cheek full of chewing tobacco" and asked, "[H]ow did that work for you?"   In response, Carter (referring to his injuries) said, "[Y]ou see all this. . . . I'm going to write it up and sue [y'all]."   Collins replied, "[W]rite it up and see what you get."   Carter then accused Collins and other officers of being cowards for abusing inmates who cannot defend themselves.   In reply, Collins made

4

comments suggesting that Carter should "keep filing paperwork" and that Collins would "teach" him.   (*Id.* at 12.)

The following morning, Carter read two disciplinary offense reports that had been served on him the previous day.   A report written by Branham alleged that Carter threatened to harm Branham while Branham was assisting in escorting Carter from the shower to his cell on the morning of November 9, 2021, in violation of Offense Code 212.   A report written by Neece alleged that Carter spit in Neece's direction while Neece was attempting to maintain control of Carter during the process of escorting Carter from the shower on the morning of November 9, 2021, in violation of Offense Code 124.   Each report listed the approximate time of the offense as 8:25 a.m.   (*Id.* at 13–14.)

On November 17, 2021, Carter used "old informal complaint forms" provided by Barton and Collins to complain about the incidents that occurred on November 9, 2021.   Carter alleges that defendant Trapp "sent them back with the updated forms" that he needed to submit.   When Carter resubmitted the updated forms, Trapp made errors in processing them.   For instance, although Carter requested to have video footage preserved from a surveillance camera in the C-3 pod, Trapp listed the wrong pod number on the grievance receipt, which would have caused prison officials to save footage from the wrong pod.   (*Id.* at 16–17, 34.)

Around the same time, Carter was supposed to have received a status change to "SM-1." As of November 29, 2021, the status change had not been made by Collins, Barton, and defendant Kegley.   While Kegley was doing rounds in Carter's pod on December 1, 2021, Carter asked her why he had not yet received the status change.   Kegley responded that she did not know or care.   That same day, Kegley and Barton conducted a 90-day Institutional Classification Authority (ICA) hearing at Carter's cell.   Kegley informed Carter that he was not

eligible for a status change because he had received a disciplinary charge under "198c."   Carter disputed this assertion and showed Kegley and Barton that he instead had been charged with violating Offense Codes 124 and 212.   Although Barton indicated that he would talk to Collins about the issue, Barton never did.   (*Id.* at 18–19.)

Carter's hearing on the disciplinary charges was initially postponed until November 30, 2021.   Carter alleges that he did not receive a hearing on that date and that his requests for video footage and other evidence were denied by defendant J.R. Adams.   Carter subsequently wrote to defendant Ramey regarding these issues, but he did not receive a response.   (*Id.* at 20.)

On December 3, 2021, Barton, at the request of Collins, housed an inmate next to Carter who did not "wash" or comply with other grooming standards.   Carter alleges that he could smell the inmate while eating, sleeping, and praying in his cell.   (*Id.* at 18–19.)

From some time prior to the initial events on November 9, 2021, through the date of the complaint, Carter remained assigned to administrative segregation at Red Onion.   Carter alleges that administrative segregation is not utilized in Wyoming and, thus, that he should not be held in segregated confinement in Virginia.   Carter also alleges that he suffers from post-traumatic stress disorder (PTSD) and borderline personality disorder (BPD), and that Collins has failed to ensure that he and other inmates in administrative segregation receive "proper mental health treatment" in accordance with "Red Onion State Prison Policy" and the "ABA Criminal Justice Standards on Treatment of Prisoners."   (*Id.* at 22–23.)

**B.   Carter's Claims**

In a section of the complaint titled "Claim[s] for Relief," Carter lists fifteen lettered claims (or groups of claims) implicating the remaining defendants.   Those claims for alleged

violations of federal and state law, as supplemented by the additional allegations in Docket No.

5, are summarized as follows:

> **Claim A**: Defendants Branham, Combs, Neece, and Barton used excessive force in violation of the Eighth Amendment and committed assault and battery under state law on November 9, 2021, and defendants Stutzman and Swiney failed to intervene.

> **Claim B**: Defendants Branham and Neece violated Carter's right to due process under the Fourteenth Amendment and committed intentional infliction of emotional distress under state law by filing false charges against Carter in an effort to justify their use of force.

> **Claims C and I**: Defendants Rosch, Collins, Clarke, White, Kegley, Barton, the Commonwealth of Virginia, and the VDOC breached the applicable ICC agreement and deprived Carter of his rights under the Eighth and Fourteenth Amendments by housing him in administrative segregation and/or by not enforcing policies applicable to inmates with mental health issues.

> **Claim D**: Defendants Baker and A. Adams violated his rights under the Eighth Amendment and committed assault and battery on November 9, 2021, by pushing Carter in a defective wheelchair that caused his feet to drag on the ground.

> **Claims E, F, and P**: Defendants King, Gilbert, White, Barton, Rosch, Clarke, the Commonwealth of Virginia, and the VDOC are subject to supervisory liability for the Eighth Amendment violations that allegedly occurred on November 9, 2021.

> **Claim H**: Defendant Collins violated Carter's rights under the First Amendment and Article I, Section 12 of the Virginia Constitution by threatening to retaliate against Carter and by providing him outdated informal complaint forms.

> **Claim J**: Defendant Collins violated federal and state law by using tobacco products on state property.

> **Claim K**: Defendants Clarke, White, the Commonwealth of Virginia, and the VDOC are subject to supervisory liability under § 1983 for allowing correctional staff to break the law by using tobacco products on state property.

> **Claim L**: Defendants Ramey and J.R. Adams failed to afford Carter due process in connection with the disciplinary charges

brought by Branham and Neece, in violation of the Fourteenth
Amendment of the U.S. Constitution and Article I, Section 11 of
the Virginia Constitution.

**Claim M**: Defendants Collins, Trapp, J.R. Adams, and Barton
deprived him of his constitutional right to access the courts by
attempting to prevent him from exhausting his administrative
remedies and by preventing him from obtaining relevant video
evidence.

**Claim N**: Defendants Collins, Trapp, Ramey, J.R. Adams, Barton,
Gilbert, King, Neece, and Branham conspired to cover up the
constitutional violations alleged in the complaint.

**Claim O**: Defendants Baker, A. Adams, King, Gilbert, Barton,
Collins, Watson, the Commonwealth of Virginia, and the VDOC
failed to protect Carter from being harmed as a result of being
transported in a defective wheelchair.

(*Id.* at 24–35.)   Additionally, in the body of the complaint, Carter asserts that defendant Barton

subjected him to cruel and unusual punishment in violation of the Eighth Amendment by placing

an unclean and malodorous inmate next to Carter in a neighboring cell.   (*Id.* at 21.)   Carter

further asserts that the alleged failure to provide proper mental health treatment constitutes a

violation of the Americans with Disabilities Act (ADA) and that his confinement in

administrative segregation "violates [his] equal protection rights to be treated like inmates in

Wyoming."   (*Id.* at 24.)

**C.  Defendants' Motion for Summary Judgment**

Defendants make two arguments in their motion for summary judgment.   First, in the

section of the supporting memorandum setting forth their interpretation of the claims asserted in

the complaint, defendants summarily argue that certain allegations "fail[] to state any sort of

claim."   (Defs.' Mem. Supp. Mot. Summ. J. 2, Dkt. No. 109.)   Second, they argue that Carter

failed to exhaust his administrative remedies prior to bringing suit, as required by the Prison

Litigation Reform Act (PLRA), 42 U.S.C. § 1997e.

Both sides have presented evidence concerning Carter's efforts to exhaust his administrative remedies.   The court discusses that evidence in context below.

## II.   DISCUSSION

### A.   Standards of Review

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). A genuine issue of material facts exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party.   *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).[4]   In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).   The court "may not weigh the evidence or make credibility determinations."   *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).

A party opposing summary judgment "may not rest upon the mere allegations or denial of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."   *Id.* at 247–48.   Instead, the nonmoving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.   *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

In their motion for summary judgment, defendants contend that certain allegations in the complaint fail to state a claim.   Although the defense of failure to state a claim is typically raised

---

[4] Internal citations, alterations, and quotation marks are omitted throughout this opinion, unless otherwise noted.

in a Rule 12(b)(6) motion, it may also be asserted in a motion for summary judgment or at trial. *See Martin v. Southwestern Va. Gas Co.*, 135 F.3d 307, 309 n.1 (4th Cir. 1998); Fed. R. Civ. P. 12(h)(2)(C).   Additionally, because the complaint was filed by a prisoner who seeks redress from governmental entities and employees, the court may sua sponte dismiss any portion of the complaint that "fails to state a claim upon which relief may be granted" or "seeks monetary relief from a defendant who is immune from such relief."   28 U.S.C. § 1915A(b).

To withstand dismissal for failure to state a claim, a pleading must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   To satisfy this requirement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   In evaluating the sufficiency of a complaint, the court must "construe the allegations and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."   *Kashdan v. George Mason Univ.*, 70 F.4th 694, 700 (4th Cir. 2023). "However, [the court] need not accept as true legal conclusions drawn from the facts or any other unwarranted deductions, unreasonable conclusions, or arguments."   *Id.   Pro se* complaints are given a liberal construction.   *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th 2006).   Nonetheless, a complaint filed by a *pro se* plaintiff "must still state a claim to relief that is plausible on its face."   *Sakyi v. Nationstar Mortg., LLC*, 770 F. App'x 113, 113 (4th Cir. 2019).

**B.   Availability of Relief under Section 1983 and the Eleventh Amendment**

As an initial matter, Carter's claims under 42 U.S.C. § 1983 against the Commonwealth of Virginia and the VDOC must be dismissed because these defendants are not "persons" subject to liability under the statute.   *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).   The same is true for any claims for damages against the individual defendants in their official

10

capacities. *Id.*; *see also Fauconier v. Clarke*, 966 F.3d 265, 279–80 (4th 2020) ("[W]hereas 42 U.S.C. § 1983 permits suit against 'every person' who deprives an individual of his or her rights under color of state law, neither States nor state officials acting in their official capacities constitute 'persons' within the meaning of the statute when sued for monetary relief.").

Additionally, a number of Carter's claims are barred by the Eleventh Amendment of the United States Constitution.   Under the Eleventh Amendment, "an unconsenting State is immune from suit brought in federal court by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).   "This immunity extends to arms of the State," including state agencies and state officials acting in their official capacities.   *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996).   Unless a State's Eleventh Amendment immunity has been waived or abrogated, any claims against a State or a state agency "are barred regardless of the relief sought," *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993), as are any "pendent state law claims against state officials in their official capacit[ies]," *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520–21 (6th Cir. 2007) (citing *Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 117–21 (1984)).   The immunity afforded by the Eleventh Amendment also extends to claims for damages against state officials sued in their official capacities for alleged violations of federal law.   *Papasan v. Allain*, 478 U.S. 265, 278 (1986).

In this case, the immunity afforded by the Eleventh Amendment has not been waived by the Commonwealth of Virginia.   *See Pennhurst*, 465 U.S. at 99 (emphasizing that such waiver must be "unequivocally expressed").[5]   Nor has the immunity been abrogated with respect to any

---

[5] "An express but limited waiver of the Commonwealth's immunity from tort claims was provided by the enactment of the Virginia Tort Claims Act in 1981."   *Melanson v. Commonwealth*, 539 S.E.2d 433, 434 (Va. 2001). Although the Act "waive[s] sovereign immunity for tort claims filed in state courts," it "does not waive the state's eleventh amendment immunity" in federal court.   *McConnell v. Adams*, 829 F.2d 1319, 1329 (4th Cir. 1987).

claims under § 1983.   "While Congress may abrogate a State's Eleventh Amendment immunity by express statutory language, it has long been settled that 42 U.S.C. § 1983 . . . does not effect such an abrogation."   *In re Sec'y of Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993).   For these reasons, the court concludes that the Eleventh Amendment bars Carter's claims under § 1983 and state law against the Commonwealth of Virginia and the VDOC, his claims for damages under § 1983 against the individual defendants in their official capacities, and his claims under state law against the individual defendants in their official capacities.   Accordingly, these claims will be dismissed.

To the extent that Carter also asserts a claim for breach of contract against certain VDOC employees in their "individual capacities," "the mere incantation of that term is not enough to make it so."   *Thorpe v. Va. Dep't of Corr.*, No. 2:20-v-0007, 2021 WL 2435868, at *3 n.5 (W.D. Va. June 15, 2021) (quoting *Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018)).   A Virginia statute sets forth the provisions that must be included in any ICC contract between the Commonwealth of Virginia and "any other state," Va. Code Ann. § 53.1-216, and the ICC agreement attached to Carter's complaint lists "the undersigned states of Virginia and Wyoming" as the contracting parties (*see* Contract between the Commonwealth of Virginia and the State of Wyoming for the Implementation of the Interstate Corrections Compact, Dkt. No. 1-1 at 1). Because the states are the real parties in interest to the ICC contract, Carter has no viable claim for breach of contract against any of the VDOC employees in their individual capacities.   And any claim for breach of contract against the Commonwealth of Virginia is barred by the Eleventh Amendment.   *See Clark v. New Mexico Dep't of Corr.*, 58 F. App'x 789, 791 (10th Cir. 2003) (concluding that the states were the real parties in interest to an ICC agreement and that any claim for breach of contract was barred by the Eleventh Amendment, even though the plaintiff

"apparently tried to avoid the Eleventh Amendment bar by suing the officials in their individual capacities").   Therefore, the claims for breach of contract asserted as part of Claims C and I will be dismissed.

## C.   Failure to State a Claim

Defendants argue that certain allegations in Carter's complaint fail to state a claim. Having reviewed the complaint, the court concludes that multiple claims are subject to dismissal for failure to state a claim upon which relief may be granted, including some of the claims that defendants neglected to mention.   The court will address these claims in turn.

### 1.   Claim B

In Claim B, Carter asserts that defendants Branham and Neece violated his right to due process under the Fourteenth Amendment by filing false disciplinary charges against him on November 9, 2021.   Carter also asserts a claim of intentional infliction of emotional distress under state law based on the same conduct.   Both claims are subject to dismissal.

As a general rule, "a false disciplinary charge cannot serve as the basis for a constitutional claim." *Cole v. Holloway*, 631 F. App'x 185, 186 (4th Cir. 2016).   Although there are exceptions to this rule, such as when a disciplinary charge is filed for an unlawful retaliatory reason, *see Booker v. S.C. Dep't of Corr.*, 583 F. App'x 43, 44 (4th Cir. 2014), Carter does not allege that Branham or Neece retaliated against him by filing false charges.   Instead, Carter claims that they did so in an effort to justify their use of force against him.   "[B]ecause filing a false disciplinary charge does not standing alone establish a Fourteenth Amendment violation," *Johnson v. Zook*, No. 1:22-cv-00920, 2023 WL 4873642, at *3 (E.D. Va. July 31, 2023), Carter's allegations in this regard fail to state a claim upon which relief may be granted under § 1983.

13

The allegations also fail to state a claim for intentional infliction of emotional distress under Virginia law.[6]   Such claims are disfavored in Virginia and require proof of the following elements: (1) that "the wrongdoer's conduct was intentional or reckless"; (2) that "the conduct was outrageous or intolerable"; (3) that "there was a causal connection between the wrongdoer's conduct and the resulting emotional distress"; and (4) that "the resulting emotional distress was severe." *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008).   With regard to the second element, mere tortious or even criminal conduct is insufficient.   *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991).   Instead, the conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."   *Id.*   The facts alleged by Carter do not meet this stringent standard.   *See, e.g.*, *Williams v. City of Mt. Vernon*, 428 F. Supp. 2d 146, 160 (S.D.N.Y. 2006) (concluding that a plaintiff's allegations of excessive force and false arrest did not describe conduct so outrageous as to "go beyond all possible bounds of decency").   Accordingly, Claim B also fails to state a cognizable claim for intentional infliction of emotional distress.

### 2.   Constitutional Claims Asserted in Claims C and I

In Claim C, Carter alleges that defendants Collins, Rosch, Clarke, and White confined him in segregation without "enforc[ing] the policy for mental health inmates."[7]   (Compl. 25–26.)   He claims that "the unlawful confinement is cruel and unusual punishment in violation of

---

[6] When a federal court in Virginia exercises supplemental jurisdiction over state claims, it must apply Virginia's choice-of-law rules.   *Felder v. Casey*, 487 U.S. 131, 151 (1988).   Because the underlying conduct occurred in Virginia, Virginia law governs the state tort claims asserted by Carter.   *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006).

[7] It is not entirely clear which "policy" Carter is referring to in Claim C.   Earlier in the complaint, Carter alleges that "the Red Onion State Prison Policy is that mental health is suppose[d] to make daily rounds conducting assessments with mentally ill inmates" housed in segregation.   (Compl. 22.)   He then references several segregation-related standards recommended by the American Bar Association.   (*Id.*)

the Eighth Amendment" because "Wyoming prohibit[s] administrative segregation."   (*Id.* at 26.)

For the same reason, Carter claims that his confinement in segregation is a violation of his right

to due process under the Fourteenth Amendment.   (*Id.*)   Similarly, in Claim I, Carter asserts

that administrative segregation is not utilized in Wyoming and that Collins, Rosch, Clarke,

White, Kegley, and Barton violated his rights under the Eighth and Fourteenth Amendments by

confining him in administrative segregation and by "changing [his] security level to a level-S

segregation."   (*Id.* at 31.)

The Eighth Amendment's prohibition of cruel and unusual punishment "applies to claims

by prisoners against corrections officials challenging conditions of confinement."   *Porter v.

Clarke*, 923 F.3d 348, 355 (4th Cir. 2019).   "Like any other Eighth Amendment claim, an

Eighth Amendment conditions of confinement claim has (1) objective and (2) subjective

components."   *Id.*   To satisfy the objective component, a prisoner must set forth facts showing

that the deprivation alleged was sufficiently serious.   *Id.*   "Only extreme deprivations" are

sufficient to satisfy this component.   *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

In particular, "a prisoner must allege a serious or significant physical or emotional injury

resulting from the challenged conditions" or "demonstrate a substantial risk of such serious harm

resulting from the prisoner's exposure to the challenged conditions."   *Id.*   To satisfy the

subjective component, an inmate must show that the prison official "actually kn[ew] of and

disregard[ed] an excessive risk to inmate health or safety."   *Farmer v. Brennan*, 511 U.S. 825,

837 (1994).   Deliberate indifference is an "exacting standard" that is not met by a showing of

"mere negligence or even civil recklessness."   *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir.

2014).

Applying these standards, the court concludes that Claims C and I fail to state a viable claim under the Eighth Amendment against any of the named defendants.   Carter's complaint does not contain factual allegations sufficient to show that any defendant actually knew of and disregarded an extreme deprivation or a substantial risk of serious harm.   Although Carter indicates that he suffers from psychological disorders, he does not plausibly allege that any of the named defendants had knowledge of his particular diagnoses, that any of the defendants were aware that his assignment to administrative segregation posed a substantial risk of serious harm to his mental health, or that any of the defendants actually knew of and ignored a serious need for additional mental health services.   To the extent that Carter relies on state correctional policies or the segregation-related policies recommended by the American Bar Association, a violation of such policies is not in itself sufficient to support an Eighth Amendment claim.   *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (rejecting the contention that a policy violation supported the inference that the defendants violated the Eighth Amendment); *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268, 279 (5th Cir. 2015) (explaining that "[a] failure to follow official policy . . . cannot support a finding of deliberate indifference"); *Sink v. Wang*, No. 7:18-cv-00350, 2021 WL 1151537, at *5 (W.D. Va. Mar. 25, 2021) (concluding that the fact that a nurse was found to have committed an unspecified policy violation in response to an inmate's grievance was "insufficient to demonstrate deliberate indifference, as required to establish an Eighth Amendment claim").   Accordingly, the Eighth Amendment claims asserted in Claims C and I will be dismissed.

Carter also claims that the named defendants violated his right to due process under the Fourteenth Amendment by confining him in administrative segregation.   The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life,

liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.   "To state a

procedural due process claim, a plaintiff must (1) identify a protected liberty or property interest

and (2) demonstrate deprivation of that interest without due process of law."   *Prieto v. Clarke*,

780 F.3d 245, 248 (4th Cir. 2015).

The Supreme Court has held that "the Constitution itself does not give rise to a liberty

interest in avoiding transfer to more adverse conditions of confinement."   *Wilkinson v. Austin*,

545 U.S. 209, 221 (2005).   In order to establish a state-created liberty interest in avoiding

confinement in segregation, an inmate must demonstrate that there is "a basis for an interest or

expectation in state regulations" for avoiding such confinement *and* that the conditions of

confinement "impose[] atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life."   *Prieto*, 780 F.3d at 249–50 (emphasis added) (citing *Sandin v. Conner*,

515 U.S. 472, 484 (1995)).

Carter's complaint does not contain sufficient factual content to allow the court to

reasonably infer that his placement in administrative segregation imposed an "atypical and

significant hardship."   *Id.*   The United States Court of Appeals for the Fourth Circuit has

explained that "whether confinement conditions are atypical and substantially harsh in relation to

the ordinary incidents of prison life is a necessarily . . . fact specific comparative exercise."

*Martin v. Duffy*, 858 F.3d 239, 253 (4th Cir. 2017).   Relying on the Supreme Court's reasoning

in *Wilkinson v. Austin*, the Fourth Circuit "has construed the atypical-and-significant hardship

analysis as turning primarily on three factors: (1) the magnitude of confinement restrictions; (2)

whether the administrative segregation is for an indefinite period; and (3) whether assignment to

administrative segregation had any collateral consequences on the inmate's sentence."   *Smith v.*

*Collins*, 964 F.3d 266, 275 (4th Cir. 2020).   Although Carter asserts that segregated confinement

is not permitted under the applicable ICC agreement and that "this in fact is atypical and significant hardship to the everyday ordinary inmate prison life" (Compl. at 31), his complaint does not describe the conditions of confinement in administrative segregation or identify any particular restrictions or consequences that imposed an atypical and significant hardship.   As the Fourth Circuit noted in *Martin*, the conclusory assertion that an inmate "suffered an atypical and significant hardship as the result of his placement in segregation" does not suffice to state a plausible claim for relief.   *Martin*, 858 F.3d at 253.   "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*   Because Carter's complaint does not include factual allegations sufficient to establish that his conditions of confinement in segregation "were atypical and significantly harsh compared to those of the general population" at Red Onion, Claims C and I fail to state a plausible due process claim. *Martin*, 858 F.3d at 253–54; *see also Gee v. Pacheco*, 627 F.3d 1178, 1193 (10th Cir. 2010) (emphasizing that a state inmate does not "have a liberty interest in his conditions of confinement (including placement in isolation and segregation), unless the facts show that the conditions impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life").

### 3.  Claims E, F, and P

In Claims E, F, and P, Carter asserts that defendants King, Gilbert, White, Barton, Rosch, and Clarke are subject to supervisory liability under § 1983 for the use of excessive force.   He alleges that these defendants had "first hand knowledge" of the events that occurred on November 9, 2021, through incident reports, grievances that Carter attempted to file, and medical reports.   (Compl. 27.)   He alleges that these defendants "still have yet to investigate this incident and other past incidents that resulted in [Carter] or other inmates receiving physical

18

injur[ies]."   (*Id.* at 29.)   He further alleges that defendants "fail[ed] to take disciplinary or other actions to curb the known pattern of physical abuse of inmates" at Red Onion.   (*Id.* at 35.)   For the following reasons, the court concludes that Carter's allegations fail to state a claim for relief under § 1983.[8]

First, to the extent that Carter seeks to hold the named defendants liable in their supervisory capacities for failing to investigate the abuse that allegedly occurred on November 9, 2021, or for failing to take disciplinary actions in response to the particular incidents described in the complaint, Carter has no viable claim against defendants under § 1983.   "While supervisory liability is a well-established concept in [Fourth Circuit] § 1983 jurisprudence, the term is a misnomer."   *Younger v. Crowder*, 79 F.4th 373, 381 n.12 (4th Cir. 2023).   As the Supreme Court has explained, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."   *Iqbal*, 556 U.S. at 677; *see also id.* at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").   A supervisor's "mere knowledge" that subordinate employees have engaged in unconstitutional conduct does not provide a basis for liability under § 1983.   *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023) (quoting *Iqbal*, 556 U.S. at 677); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in [constitutional] violations are responsible . . . . Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner

---

[8] To the extent that the complaint could be construed as attempting to assert a claim of negligent supervision under state law, any such claim also fails because negligent supervision is not a valid cause of action in Virginia.   *A.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 475 (Va. 2019).

violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not.").

Carter's allegations are also insufficient to satisfy the three-factor test for supervisory liability set forth in *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).   "That test asks (1) whether 'the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury'; (2) whether 'the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) whether 'there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."   *Younger*, 79 F.4th at 384 (quoting *Shaw*, 13 F.3d at 799).   To satisfy the first element, a plaintiff must show that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."   *Wilkinson v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).   "As to the second element, a plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses."   *Id.*   Finally, as to the third element, "[c]ausation is established when the plaintiff demonstrates an affirmative causal link between the supervisor's inaction and the harm suffered by the plaintiff."   *Shaw*, 13 F.3d at 799.

Carter's complaint does not contain sufficient facts to support each of these elements. His conclusory assertions against the individual defendants named in Claims E, F, and P fail to state a cognizable claim for relief under § 1983.   *See Hoffman v. Office of the State Att'y*, 793 F. App'x 945, 954 (11th Cir. 2019) ("Because the plaintiffs' claims of supervisory liability are supported by conclusory allegations, the complaint does not contain sufficient factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

### 4. **Claim H**

In Claim H, Carter asserts claims of retaliation against defendant Collins.   He alleges that Collins threatened to retaliate against him on November 9, 2021, when he told Collins that he was going to file grievances and a lawsuit against the officers responsible for physically assaulting him.   (*See* Compl. 12 ("[Collins] stated write it up and see what you get."); *id.* at 30 ("Collins clearly stated to keep filing paperwork" and "made the statement in the context of a threat.").)   Carter further alleges that Collins engaged in retaliation by providing him outdated complaint forms in an effort to prevent him from exhausting his administrative remedies with respect to the incidents that occurred on November 9, 2021.   (*See id.* at 36.)   Carter claims that these alleged actions violated his rights under the First Amendment and Article I, Section 12 of the Virginia Constitution.

Because Article I, Section 12 is "coextensive" with the applicable provisions of the First Amendment, "the analysis is the same" for the federal and state constitutional claims asserted in Claim H.   *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 608 (E.D. Va. 2015) (addressing claims of retaliation under the First Amendment and Article I, Section 12 of the Virginia Constitution).   "To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant['s] conduct."   *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023).

It is well established that inmates have a "First Amendment right to be free from

retaliation for filing a grievance." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017).   Thus, Carter's allegations satisfy the first element of a retaliation claim.   The second element, however, is not supported by the facts alleged in the complaint.   For purposes of the second element, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). "This objective inquiry examines the specific facts of each case taking into account the actors involved and their relationship." *Booker*, 583 F. App'x at 44.   Additionally, a plaintiff must show that the challenged conduct caused "more than a de minimis inconvenience." *Snoeyenbos v. Curtis*, 60 F.4th 723, 731 (4th Cir. 2023).

The conduct on which Carter relies to support his claims of retaliation does not satisfy these requirements.   At most, the comments that Collins purportedly made to Carter "constitute vague threats that would be insufficient to deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. 2020).   "It is well-settled that insulting or disrespectful comments directed at an inmate generally do not rise to the level of a constitutional violation, and that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Id.*; *see also Holleman v. Zatecky*, 951 F.3d 873, 880–81 (7th Cir. 2020) (noting that "the harsh realities of a prison environment affects [the] consideration of what actions are sufficiently adverse").   While Carter also alleges that Collins provided outdated forms in response to his request for informal complaints, he acknowledges that defendant Trent "sent them back with the updated forms" that he needed to submit.   (Compl. 16.)   Carter does not plausibly allege that this added step caused "more than a de minimis inconvenience."

22

*Snoeyenbos*, 60 F.4th at 731; *see also Hayes*, 976 F.3d at 274 (declining to find that vague threats accompanied by a month-long delay in filing a grievance rose to the level of a constitutional violation).   Additionally, although the standard is an objective one, it "bears noting" that Collins's alleged threats did not prevent Carter from utilizing the VDOC's grievance procedure to file complaints regarding the events that allegedly occurred on November 9, 2021. *Id.* at 274; *see also Constantine*, 411 F.3d 474 at 500 (recognizing that a "plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment Activity").

For these reasons, the court concludes that Carter's complaint fails to state a cognizable claim of retaliation in violation of the First Amendment or Article I, Section 12 of the Virginia Constitution.   Consequently, Claim H will be dismissed.

### 5.  Claims J and K

In Claim J, Carter alleges that defendant Collins violated federal and state law by using chewing tobacco on state grounds on November 9, 2021, and on other occasions.   Carter asserts that tobacco products are considered "contraband" and that individuals who use tobacco products on state grounds are "breaking the law" and "committing a crime."   In Claim K, Carter alleges that defendants Clarke and White have "personal knowledge" that Collins and other VDOC employees are using tobacco products on state grounds and that these supervisory officials are "responsible for not stopping it."   (Compl. 32–33.)

Carter does not cite to any particular federal or state law that prohibits the use of tobacco products on state property, much less a federal or state law that is privately enforceable through a civil action.   *See Doe v. Broderick*, 225 F.3d 440, 447 (4th Cir. 2000) (explaining that "the violation of a federal statute is not actionable under section 1983 if . . . the statute does not create

enforceable rights, privileges or immunities within the meaning of § 1983"); *Cherrie v. Va. Health Servs.*, 787 S.E.2d 855, 858 (Va. 2016) ("A statutory right of action no doubt exists when a statute expressly authorizes it.   There are dozens of examples of this in the Code of Virginia.   When a statute is silent, however, we have no authority to infer a statutory private of action without demonstrable evidence that the statutory scheme necessarily implies it.   The necessity for such an implication must be palpable.   We would never infer a private right of action based solely on a bare allegation of a statutory violation.").   Moreover, as a private citizen, Carter has no "judicially cognizable interest in the prosecution or non-prosecution of another."   *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973).   Thus, even assuming Collins or any other correctional officer "broke the law" by using tobacco products at Red Onion, Claims J and K fail to state a claim upon which relief may be granted.

### 6.  Claim L

In Claim L, Carter asserts that defendants Ramey and J.R. Adams failed to afford him due process in connection with the disciplinary charges that he received on November 9, 2011. He alleges that the hearing officers ignored a policy prohibiting "stacked charges" based on conduct that occurred at the same time, that the hearings were not conducted within 45 days of the alleged misconduct, and that J.R. Adams denied his request for evidence and made a false statement in the disciplinary paperwork.   (*Id.* at 33.)   Carter claims that these defendants violated his right to due process under the Fourteenth Amendment and Article I, Section 11 of the Virginia Constitution.

"Because the due process protections afforded under the Constitution of Virginia are co-extensive with those of the federal constitution," the same analysis applies to the federal and state constitutional claims asserted in Claim L.   *Shivaee v. Commonwealth*, 613 S.E.2d 570, 574

24

(Va. 2005).   In *Wolff v. McDonnell*, 418 U.S. 539 (1974), "the Supreme Court recognized that constitutional due process protections extend to prison disciplinary proceedings that could adversely impact an inmate's liberty interests—such as the loss of good time credits," *Lennear v. Wilson*, 937 F.3d 257, 268 (4th Cir. 2019).   "The Supreme Court held that in a disciplinary proceeding in which an inmate's liberty interests are at stake, government officials must provide the inmate with written notice of the charges at least 24 hours before the hearing as well as a written report after the hearing detailing the evidence relied upon and the reasons for the disciplinary action."   *Id.*   The Court "further recognized that, in such proceedings, an inmate has a qualified right to call witnesses and present documentary evidence in his defense."   *Id.* Such evidence includes "prison video surveillance evidence."   *Id.* at 269.

Importantly, however, the procedural due process protections outlined in *Wolff* "apply only when a prisoner's constitutional interests are implicated."   *David v. Derosa*, 176 F. App'x 258, 259 (3d Cir. 2006) (citing *Sandin*, 515 U.S. at 487); *see also Wolff*, 418 U.S. at 571 n.19 ("We do not suggest . . . that the procedures required by today's decision for the deprivation of good time would also be required for the imposition of lesser penalties such as the loss of privileges.").   A prison disciplinary action does not implicate a liberty interest requiring due process safeguards unless it inflicts "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" or "inevitably affect[s] the duration of his sentence." *Sandin*, 515 U.S. at 484, 487; *see also McNeil v. Currie*, 84 F. App'x 276, 277 (4th Cir. 2003) ("We conclude that McNeill was not entitled to due process protections with respect to his disciplinary hearings . . . , because the disciplinary actions taken and McNeill's placement in administrative segregation did not create an atypical or significant hardship in relation to the ordinary incidents of prison life.").

Carter's complaint does not set forth facts sufficient to establish that either of the underlying disciplinary actions triggered the protections of the Fourteenth Amendment or Article I, Section 11.   He does not describe the outcome of the disciplinary proceedings, much less plausibly allege that he was subjected to any atypical and significant hardship as a result of either disciplinary action.   Consequently, Carter's allegations regarding the actions of the disciplinary hearing officers fail to state a cognizable federal or state constitutional claim for denial of due process.[9]

### 7. Claim M

Claim M is titled "Denial Access to Court Interference."   Carter asserts that defendants Collins, Trapp, Ramey, J.R. Adams, and Barton each played a "part in impeding [him] from exhausting the administrative remedies and bring[ing] legal actions of the incident on 11-9-21." He alleges that Collins and Barton gave him outdated forms to use to initiate the grievance process and that Trapp incorrectly processed one of his written complaints.   He further alleges that Ramey and J.R. Adams "denied [him] important evidence that would be useful in a civil action." He claims that these actions violated his federal constitutional rights, including his right to access the courts.   (Compl. 34.)

Carter's allegations fail to state a claim for two reasons.   First, "inmates have no constitutional or due process interest in access to a grievance procedure."   *Booker*, 855 F.3d at 541.   Consequently, an inmate "cannot bring a § 1983 claim alleging denial of a specific

---

[9] Exhibits submitted in response to defendants' motion for summary judgment indicate that Carter was convicted of both disciplinary offenses with which he was charged on November 9, 2021, and that he was penalized with a fine of $7.00 for one charge and a fine of $10.00 for the other. (*See* Pl.'s Br. Opp'n M. Summ. J. Ex. D-2, Dkt. No. 112-3 at 27–28.)   "[M]any courts, including this one, have held that such small monetary fines do not trigger constitutional due process protections."   *Williams v. Gilbert*, No. 7:22-cv-00667, 2023 WL 4572324, at *6 (W.D. Va. July 18, 2023) (collecting cases).   Thus, these exhibits do not alter the court's decision with respect to Claim L.

grievance process." *Id.*   Thus, the mere failure to provide a grievance form or to properly process a grievance is not independently actionable under § 1983.

Carter's complaint also fails to state a constitutional claim for denial of access to the courts.   To state such a claim, a plaintiff must plead facts showing that he suffered an "actual injury" as a result of an official's conduct.   *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).   In particular, the plaintiff must demonstrate that he was "frustrated or impeded in his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement."   *Gee*, 627 F.3d at 1191.   Examples of an actual injury include "missing a court-imposed deadline or being unable to file a complaint" because of a defendant's actions.   *Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015).

Carter's allegations do not satisfy the "actual injury" requirement. The challenged conduct did not prevent Carter from filing this action, and Carter does not allege that defendants prevented him from filing any other action regarding his conditions of confinement. Moreover, an inmate's "right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances." *Malott v. Weaver*, No. 1:18-cv-00062, 2018 WL 1357825, at *8 (W.D. Mich. Mar. 16, 2018). This is because the exhaustion requirement of the PLRA "only mandates exhaustion of available remedies."   *Id.* (citing 42 U.S.C. § 1997e(a)).   If prison officials prevent an inmate from using a grievance procedure, the procedure is unavailable and "the exhaustion requirement does not come into play."   *Griffin v. Bryant*, 56 F.4th 328, 335 (4th Cir. 2022).   In light of the foregoing, the court concludes that Carter's complaint fails to state a viable claim for denial of access to the courts based on the alleged efforts to prevent him from exhausting his administrative remedies.

To the extent that Carter alleges that Trapp, Ramey, and J.R. Adams prevented him from

obtaining video footage of the incidents that purportedly occurred on November 9, 2021, his allegations fare no better.   Carter's inability to view requested video footage did not prevent him from providing a detailed description of the incidents in his complaint.   Because Carter does not allege that the denial of access to video footage "resulted in specific harm to his litigation of a nonfrivolous claim," his complaint fails to state a claim for denial of access to the courts. *Harvey v. Maughan*, No. 7:20-cv-00405, 2021 WL 724611, at \*7 (W.D. Va. Feb. 24, 2021). Accordingly, Claim M will be dismissed.

### 8. Claim N

In Claim N, Carter asserts that Collins, Trapp, Ramey, J.R. Adams, Barton, Gilbert, King, Branham, and Neece "conspired to cover up the . . . First and Eighth Amendment violations," thereby violating his constitutional rights.   To establish a civil conspiracy under § 1983, a plaintiff must allege facts indicating that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right."   *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996).   The plaintiff's allegations "must, at least, reasonably lead to the inference that [the] defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan."   *Id.*   "Where the complaint makes only conclusory allegations of a conspiracy under § 1983 and fails to demonstrate any agreement or meeting of the minds among the defendants, the court may properly dismiss the [conspiracy claim]."   *Brown v. Angelone*, 938 F. Supp. 340, 346 (W.D. Va. 1996).

Carter's complaint is devoid of factual allegations suggesting that an agreement or meeting of the minds existed between any of the named defendants.   His conclusory assertion that the named defendants conspired to cover up the constitutional violations alleged in the

complaint is insufficient to state a plausible claim for relief.   *Id.*; *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (explaining that "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed"); *Delk v. Moran*, No. 7:16-cv-00554, 2018 WL 1513296, at *8 (W.D. Va. Mar. 27, 2018) ("Merely labeling a chronological series of actions by multiple defendants as 'conspiracy' or providing only a conclusory, formulaic recitation of the legal elements of conspiracy will not do.").   Therefore, Claim N will be dismissed.

### 9.  Claims Asserted in the Body of the Complaint

Carter asserts three additional claims in the body of the complaint.   All three claims are subject to dismissal for failure to state a claim.

First, Carter fails to state a cognizable violation of the Eighth Amendment resulting from being housed next to an inmate with poor personal hygiene habits.   While the inmate's body odor may have been unpleasant, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."   *Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004).   Because Carter does not plausibly allege that his exposure to the challenged conditions posed a "substantial risk of serious harm," *De'Lonta*, 330 F.3d at 634, or that the defendants responsible for moving the other inmate actually knew of and disregarded an excessive risk to his health or safety, *Farmer* 511 U.S. at 837, this claim will be dismissed.

Second, the alleged failure to provide daily mental health screenings or other specific forms of mental health treatment does not support a claim for relief under the ADA.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   "To make out a violation of the ADA, a plaintiff must show that: (1) he has a disability; (2) he is otherwise qualified to receive the benefits of a public service, program or activity; and (3) he was denied those benefits, or otherwise discriminated against, based on his disability."  *Richardson v. Clarke*, 52 F.4th 614, 619 (4th Cir. 2022).   Carter does not allege that he was discriminated against based on a mental disability or that any mental disability served as the basis for the denial of care.   Accordingly, his complaint fails to state claim under the ADA.  *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (holding that the ADA "would not be violated by a prison's simply failing to attend to the medical needs of its disabled prisoners"); *see also Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) ("At its core, the issue here is not whether Tardif was denied medical services *because* he has a disability. Instead, her claim relates solely to whether she received adequate medical treatment in police custody *for* her disability, and such a claim is not cognizable under the ADA.").

Finally, Carter's assertion that he is "being treated harsher than Wyoming inmates" does not suffice to state a violation of his right to equal protection under the Fourteenth Amendment. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.   "It is essentially a direction that all persons similarly situated should be treated alike."  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606 (4th Cir. 2020).   "This does not mean, however, that all prisoners must receive identical treatment and resources."  *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013).   "In order to [state] an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others

who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athl., Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011).

Carter's complaint does not set forth sufficient facts to satisfy either element. Carter has not plausibly alleged that he is being treated less favorably than "persons who are in *all relevant respects* alike," *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992), or that that any difference in treatment was "the result of intentional or purposeful discrimination," *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). Carter is not incarcerated in Wyoming, and the mere fact that he was convicted in that state does not make him similarly situated to every other inmate incarcerated there. His conclusory assertion that he is being treated more harshly than inmates incarcerated in Wyoming does not state a valid claim for relief under the Equal Protection Clause. *See Pronin*, 628 F. App'x at 164 (noting that "a valid claim for a violation of equal protection . . . must allege the requisite discriminatory intent with more than mere conclusory assertions").

## D.   Failure to Exhaust

Based on the above rulings, the only claims that remain to be decided are the Eighth Amendment and state tort claims asserted against the defendants who allegedly used, or failed to intervene in the use of, physical force on November 9, 2021, and the defendants who allegedly used, or failed to intervene in the use of, a defective wheelchair (Claims A, D, and O.) Defendants have moved for summary judgment on these claims on the basis that Carter failed to exhaust his administrative remedies before filing suit, as required by the PLRA.[10]

---

[10] Defendants have also argued that Carter failed to exhaust certain other claims. Because the other claims will be dismissed for failure to state a claim, the court finds it unnecessary to address the exhaustion arguments raised with respect to those claims.

The PLRA provides that "[n]o action shall be brought" in federal court by an inmate challenging prison conditions "until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   The Supreme Court has held that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), and that "proper exhaustion" is required, which includes "compliance with an agency's deadlines and other critical procedure rules," *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).   Moreover, district courts "may not excuse a failure to exhaust."   *Ross v. Blake*, 578 U.S. 632, 639 (2016).

Prison officials have the burden to prove an inmate's failure to exhaust available administrative remedies.   *Jones v. Bock*, 549 U.S. 199, 211–12 (2007).   Once defendants present evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or that administrative remedies were unavailable.   *See, e.g.*, *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011).

"[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it."   *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2018).   The Supreme Court has explained that an administrative remedy is considered unavailable when: (1) "it operates as a simple dead end," with prison officials "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque" that it is "practically . . . incapable of use" because "no ordinary prisoner can discern or navigate it"; or (3) "prison administrators thwart inmates from taking advantage of a grievance procedure through machination, misrepresentation, or intimidation."   *Ross*, 578 U.S. at 643; *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) ("[W]hen prison officials prevent inmates

from using the administrative process . . . , the process that exists on paper becomes unavailable in reality.").

### 1.   The VDOC's Grievance Procedure

VDOC Operating Procedure (OP) 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints, and it applies to most aspects of prison life.   OP 866.1 provides that most issues that affect an inmate personally are grievable, but there are some exceptions, including matters beyond the control of the VDOC, such as court decisions, decisions of other agencies, and laws and regulations.   Additionally, the grievance process may not be used to challenge disciplinary hearings or convictions.   (Meade Aff. ¶ 5, Dkt No. 109-1.)

OP 866.1 requires that, before submitting a formal grievance (referred to in the policy as a "regular grievance"), an inmate must demonstrate that he has made a good faith effort to resolve the issue informally through the procedures available at the institution.   If a verbal complaint is not resolved to the inmate's satisfaction, he may submit an informal complaint (referred to in the policy as a "written complaint") to the appropriate department head.   (*Id.* ¶ 6; *see also* Meade Aff. Ex. A, OP 866.1 § II(B).)   The response to the written complaint should be provided within 15 calendar days.   (Meade Aff. ¶ 6.)   If the issue raised in a written complaint is not resolved to the satisfaction of the inmate, or the inmate does not receive a response within 15 days, the inmate must initiate a regular grievance by filling out the appropriate form.   Regular grievances generally must be submitted within 30 days from the date of the incident or the discovery of the incident.   (OP 866.1 § I(D)(4).)   When filing a regular grievance, an inmate must attach documentation showing that the inmate attempted to informally resolve the issue.   (Meade Aff. ¶ 5.)

33

Following the receipt of a regular grievance, prison officials have two days to accept or reject it.   (OP 866.1 § I(D)(5).)   If a regular grievance satisfies the intake criteria, "staff must accept the grievance and log it into VACORIS using the received date."   (*Id.* § III(C)(3).)   If the grievance does not meet the intake criteria, prison officials must return it to the inmate with an explanation for its rejection.   (*Id.* § III(C)(4).)   For instance, a grievance may be rejected if it raises more than one issue, the filing period has expired, the grievance is repetitive, or it is a request for services.   (Meade Aff. ¶ 7.)   If an inmate disagrees with the intake decision, the inmate may appeal the decision to the regional ombudsman.   (*Id.*)

When a regular grievance is accepted during the intake process, the warden or superintendent conducts a Level I review.   If the inmate is dissatisfied with the determination at Level I, the inmate may appeal the determination to Level II.   Level II responses are provided by the regional administrator, the health services director, or another designated official.   "For most issues, Level II is the final level of review."   (*Id.* at ¶ 8.)   OP 866.1 explains that "[a]n offender must exhaust all the requirements of the *Offender Grievance Procedure* before the offender can seek judicial relief" and that "[t]he exhaustion requirement is met only when a *Regular Grievance* has been accepted into the grievance process and appealed, without satisfactory resolution of the issue."   (OP 866.1 § (V)(A)–(B).)

### 2.  Carter's Exhaustion Efforts

As noted above, both sides have presented evidence concerning Carter's efforts to exhaust his administrative remedies, including supplemental affidavits and exhibits.   The court will grant Carter's motion to supplement his response to defendants' motion for summary judgment (Dkt. No. 123) and consider the supplemental evidence submitted by Carter and defendants.

The record reflects that on November 11, 2021, Carter submitted an "informal complaint" alleging that correctional officers used excessive force against him in the C-3 pod on November 9, 2021, and that he suffered injuries to his feet as a result of being transported to the medical unit in defective wheelchair.   In a response dated November 16, 2021, defendant Trapp instructed Carter to resubmit the complaint using the "updated form attached."   (Compl. Ex., Dkt. No. 1-1 at 19.)

Carter subsequently submitted a "written complaint" alleging that officers used excessive force against him in the C-3 pod between 8:30 a.m. and 9:00 a.m. on November 9, 2021.   He described the actions allegedly taken against him while he was in restraints and requested that surveillance footage be reviewed "from the time [he] was removed from the shower until [he] was removed from the pod in a wheelchair."   (Meade Aff. Ex. B, Dkt No. 109-1.)   Trapp logged the written complaint as ROSP-21-INF-02027 and issued Carter a grievance receipt. (Compl. Ex., Dkt. No. 1-1 at 21.)   Defendant Barton responded to the informal complaint on November 30, 2021.   (*See* Meade Aff. Ex. B. ("You became disruptive in the pod and after the altercation you were taken to medical to be assessed.").)

According to Meade's affidavit, Carter did not file any additional grievance documents related to the incidents described in ROSP-21-INF-02027.   (Meade Aff. ¶ 12.)   Therefore, defendants argue that Carter's claims under the Eighth Amendment and state law arising from the use of force and the use of a defective wheelchair are barred under the PLRA because he failed to exhaust his administrative remedies before filing suit.

Carter disputes the assertion that he did not file any additional grievance documents pertaining to the physical injuries that he received on November 9, 2021.   In an affidavit accompanying his initial response to defendants' motion for summary judgment, Carter states

that he "filed a regular grievance" on December 3, 2021, along with the receipt that he received for the related written complaint.   Carter avers that the grievance was rejected on the basis that it pertained to a non-grievable disciplinary matter.   The affidavit indicates that defendant "Trapp marked it as non-grievable and referred [Carter] to use the disciplinary appeal [process]." (Carter Aff. ¶ 23, Dkt. No. 112-2.)   Because the grievance was rejected, Carter asserts that he had "no available administrative remedy."   (*Id.* at ¶ 37.)

On December 1, 2023, Carter submitted a supplemental declaration indicating that he had recently found the "regular grievance concerning the incident on 11-9-2021" that had been rejected by Trapp.   (Carter Supp'l Decl. ¶ 10, Dkt. No. 123-1.)   He states under penalty of perjury that the attached exhibit "is the grievance [he] did submit" concerning the events that allegedly occurred on November 9, 2021.   (*Id.* at ¶ 12.)   The exhibit is a regular grievance signed by Carter on December 3, 2021, which includes the following statement on the first page:

> I'm continuing this complaint concerning the excessive force used against me on 11-9-21 by Officer Branham, Combs, Neece and LT Barton . . . . Branham tripped and slammed me for no reason because I told him he was weak, after being slammed LT Barton and other assisting officers came and Barton was on my back closing the handcuff tighter around my wrist while Officer Neece gave me body blows, and I received 2 disciplinary charges from Branham and Neece to try and cover up their actions.   I wrote this up on Grievance # ROSP-21-INF-02027 and I have not received a response back so I have attached the grievance receipt.   This incident affected me because I was assaulted and received physical injuries.   Also while pushed to medical in a broken wheelchair that allowed my feet to drag[] on concrete damaging my feet no staff stopped this.   I'm requesting an impartial investigation into the incident and . . . I will be seeking legal actions for damages.

(Carter Supp'l Aff. Ex., Dkt. No. 123-2 at 1.)   The second page of the regular grievance contains handwritten marks indicating that the grievance was rejected on the basis that it related to a non-grievable disciplinary issue.   The exhibit indicates that it was signed by Trapp on December 6,

2021.   (Dkt. No. 123-2 at 2.)

Defendants submitted additional evidence in response to Carter's supplemental filing, including a declaration executed by Trapp.   Trapp denies signing the regular grievance that Carter submitted as an exhibit and asserts that she did not work on the date on which it was allegedly signed.   (Trapp Decl. ¶¶ 4, 5, Dkt. No. 128.)   She also asserts that "[t]he absence of a date stamp" on the regular grievance indicates that it was not actually received by the grievance department at Red Onion, since "it was the regular practice" of the grievance department to date-stamp every grievance that the department received.   (*Id.* at ¶ 6.)   In addition to Trapp's declaration, defendants submitted a declaration executed by T. Hale.   According to that declaration, attached time sheets indicate that Trapp did not work on December 6, 2021.   (Trapp Decl. ¶ 6, Dkt. No. 124-2.)

Carter submitted a "declaration reply" on December 29, 2023, along with additional exhibits.   The additional exhibits include copies of other regular grievances that were rejected during the intake process.   Carter points out that the grievances were not date-stamped before being returned to him, thus refuting the contention that the grievance department date-stamps every grievance it receives.   Carter also disputes any suggestion that he or another inmate forged Trapp's signature.   (*See* Carter Decl. Reply, Dkt No.127; Carter Decl. Reply Exs A–C, Dkt. No. 127-1.)

Viewing the record in the light most favorable to Carter, as the court must on summary judgment, the court concludes that Carter has presented sufficient evidence to create a genuine issue of material fact as to whether he submitted a regular grievance complaining about the actions that allegedly resulted in physical injuries on November 9, 2021, and as to whether the regular grievance was improperly rejected at intake, rendering administrative remedies

unavailable to him.  *See, e.g., Tory v. Davis*, No. 21-6649, 2022 WL 17716775, at *2 (4th Cir.

Dec. 15, 2022) (explaining that administrative remedies may have been unavailable to an inmate

if VDOC employees "rendered it impossible for [the inmate] to exhaust his administrative

remedies" by "incorrectly reject[ing]" his grievances); *Allen v. Shelton*, No. 7:22-cv-00408, 2023

WL 6389807, at *12 (W.D. Va. Sept. 29, 2023) ("If the grievance department rejects a grievance

for plainly incorrect (and indeed irrational) reasons, the administrative process was not available

to the inmate 'through no fault of his own.'") (quoting *Moore*, 517 F.3d at 725).

The parties' disputes concerning the legitimacy of the supplemental exhibit submitted by

Carter require credibility determinations that cannot be made in the context of a motion for

summary judgment.[11]   As the Fourth Circuit has made clear, "[a] district court may not weigh

the evidence or make credibility determinations, and is not in a position to disregard stories that

seem hard to believe."  *Harris*, 927 F.3d at 272.   Those tasks are for the finder of fact, not a

district court ruling on a motion for summary judgment.  *Gray v. Spillman*, 925 F.2d 90, 95 (4th

Cir. 1991); *see also Pumphrey v. Coakley*, 684 F. App'x 347, 349 (4th Cir. 2017) (reversing a

grant of summary judgment on the issue of exhaustion based on the determination that "the

district court improperly made a credibility determination at the summary judgment stage").

Thus, defendants' motion for summary judgment will be denied without prejudice with respect to

---

[11] Defendants alternatively argue that the portion of the regular grievance on which Carter relies is "inadmissible hearsay" that cannot be considered under Rule 56(c)(2).   This argument is without merit.   Hearsay is an out-of-court statement offered by a party "to prove the truth of the matter asserted in the statement."   Fed. R. Evid. 801(c)(2).   Carter does not offer the statements on the intake section of the grievance to prove that he was complaining about a non-grievable disciplinary issue.   Instead, he argues that they support his position that the regular grievance was improperly rejected at intake, making it impossible for him to satisfy the exhaustion requirement.  *See Perez v. Parker*, No. 1:14-cv-04286, at *2 (N.D. Ill. Mar. 19, 2019) (denying a motion to bar testimony regarding the contents of grievances on the basis of hearsay and explaining that the plaintiff was merely "testifying as to their existence, including what he did with them and what others allegedly did or not do with them"); *Goings v. Potter*, 3:17-cv-00717, 2018 WL 1696654, at *3 (N.D. Ind. Apr. 6, 2018) (explaining that the plaintiff's testimony as to an officer's statement that an issue could not be grieved was not hearsay because it was offered to show that the officer misrepresented the availability of the grievance process, not to prove the truth of the officer's statement).

Claims A, D, and O, and the court will refer the matter for an evidentiary hearing on the exhaustion issues.

### III.   CONCLUSION

For the foregoing reasons, all of the claims asserted in Carter's complaint will be dismissed for failure to state a claim, with the exception of Claims A, D, and O.   Plaintiff's motion to supplement his response to defendants' motion for summary judgment will be granted, and defendants' motion for summary judgment will be granted in part (as to allegations that fail to state a claim) and denied without prejudice in part (as to Claims A, D, and O).   Any other claims that were not addressed in defendants' motion will be dismissed pursuant to 28 U.S.C. § 1915A(b).   An appropriate order will be entered.

Entered: March 24, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge